T.C. Memo. 2010-76

UNITED STATES TAX COURT

RECOVERY GROUP, INC., ET AL.,[1] Petitioners v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 12430-08, 29314-07,     Filed April 15, 2010.
             29321-07, 29326-07,
             29333-07, 29335-07,
             29336-07, 29385-07.

        Recovery Group, Inc. (RG), an S corporation,
redeemed all of the stock held by E, a minority
shareholder and employee.  In addition to paying E for
his 23-percent interest in the company, RG also paid E
$400,000 to enter into a 1-year covenant not to
compete.  RG deducted the cost of the covenant not to
compete over its 12-month term.  The IRS determined

        [1]Cases of the following petitioners are consolidated here:
Robert J. Glendon and Yvonne M. Glendon, docket No. 29314-07;
John S. Sumner, Jr., and Mary V. Sumner, docket No. 29321-07;
Stephen S. Gray and Linda Baron, docket No. 29326-07; Michael
Epstein and Barbara Epstein, docket No. 29333-07; Anthony J.
Walker and Pamela S. Mayer, docket No. 29335-07; Andre Laus and
Helen Laus, docket No. 29336-07; and Parham Pouladdej, docket No.
29385-07.

that RG could not immediately deduct the covenant not to compete and determined built-in gains taxes under I.R.C. sec. 1374 and accuracy-related penalties for RG under I.R.C. sec. 6662.  The disallowed deductions increased the taxable income flowing through RG to its shareholders, and the IRS also determined deficiencies in the shareholders' tax.

Held:  The cost of the covenant not to compete may not be amortized over its 1-year term; the covenant is an amortizable I.R.C. sec. 197 intangible and must be amortized over 15 years.

Held, further, RG reasonably relied on competent, fully informed professionals to prepare its tax returns and thereby satisfies the reasonable cause and good faith exception of I.R.C. sec. 6664(c) and avoids liability for the accuracy-related penalty.

Peter L. Banis and D. Sean McMahon, for petitioners.

Paul V. Colleran, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, Judge:  These cases are before the Court pursuant to section 6213(a)[2] for redetermination of deficiencies in tax and penalties for 2002 and 2003, which the Internal Revenue Service (IRS) determined against Recovery Group, Inc. (Recovery Group), and its shareholders.  The determination against Recovery Group, an S corporation, was made pursuant to section 1374 (see infra note 5) and was as follows:

[2]Except as otherwise noted, all section references are to the Internal Revenue Code (26 U.S.C.), and all Rule references are to the Tax Court Rules of Practice and Procedure.

|  | | | | Accuracy-Related Penalties | |
| | | | | Sec. 6662 | |
| Petitioner | Docket No. | Deficiencies 2002 | 2003 | 2002 | 2003 |
| --- | --- | --- | --- | --- | --- |
| Recovery Group, Inc. | 12430-08 | $46,138 | $70,011 | $9,288 | $14,002 |

The IRS determined the following deficiencies in the Federal income taxes of Recovery Group's shareholders:

| Petitioner(s) | Docket No. | 2002 | 2003 |
| --- | --- | --- | --- |
| Robert J. & Yvonne M. Glendon | 29314-07 | $2,599 | $2,825 |
| John S. & Mary V. Sumner | 29321-07 | 2,824 | 3,071 |
| Stephen S. Gray & Linda Baron | 29326-07 | 20,790 | 22,603 |
| Michael & Barbara Epstein | 29333-07 | 1,970 | -0- |
| Anthony J. Walker & Pamela S. Mayer | 29335-07 | 1,695 | 1,431 |
| Andre & Helen Laus | 29336-07 | 5,197 | 4,494 |
| Parham Pouladdej | 29385-07 | 10,395 | 11,301 |
| Total | | 45,470 | 45,725 |

All of the disputed deficiencies result from the IRS's determination that the cost of a covenant not to compete must be amortized over 15 years. The IRS determined accuracy-related penalties against Recovery Group only; it determined no penalties against the subchapter S shareholders.

The issues for decision are:

1. Whether Recovery Group may amortize the cost of a covenant not to compete over its 12-month term or whether it must amortize that cost over 15 years pursuant to section 197(a). We find that the covenant is an amortizable section 197 intangible,

and we sustain respondent's determination that it must be amortized over 15 years.

2. Whether Recovery Group is liable under section 6662 for accuracy-related penalties on the underpayments that result from disallowance of the excess deductions it took by amortizing the covenant not to compete over its 12-month term. We find that because Recovery Group reasonably relied on its accountants to prepare its returns, it had reasonable cause and acted in good faith in filing its returns and is not liable for the penalties.

FINDINGS OF FACT

The parties do not dispute the facts in these cases that relate to the amortization of the covenant not to compete, but they do dispute the facts related to the accuracy-related penalty. We incorporate by this reference the stipulation of facts filed June 24, 2009, and the attached exhibits.

Recovery Group is a "turn-around, crisis-management business" providing consulting and management services to insolvent companies, together with services as bankruptcy trustee, examiner in bankruptcy cases, and receiver in Federal and State courts. Recovery Group had its principal place of business in Massachusetts when it filed its petition in this Court.[3]

_____

[3]The residences of the Recovery Group shareholders when they filed their respective petitions were as follows:

(continued...)

<u>Employee/Shareholder's departure</u>

In 2002 James Edgerly, one of Recovery Group's founders, employees, and minority shareholders, informed its president, Stephen Gray, that he wished to leave the company and to have his shares bought out and settle various debts between himself and the company.  Mr. Gray, who is also a founder and shareholder, discussed the departure with the remaining shareholders and developed a framework for the buyout.  He then asked the company's accountant, Ron Orleans, to calculate the buyout numbers and tell Mr. Gray how the transaction should work.  Mr. Gray explained to Mr. Edgerly the structure and the financial details of the proposed buyout agreement.  Mr. Edgerly considered the offer and then accepted it.

Mr. Edgerly held 18,625 shares of Recovery Group stock, which represented 23 percent of the outstanding stock of the company.  The agreement between Mr. Edgerly and Recovery Group called for the company to pay him a total of $805,363.33, in

---

[3](...continued)

| Petitioner | Docket No. | Residence |
| --- | --- | --- |
| Robert J. & Yvonne M. Glendon | 29314-07 | Massachusetts |
| John S. & Mary V. Sumner | 29321-07 | North Carolina |
| Stephen S. Gray & Linda Baron | 29326-07 | Massachusetts |
| Michael & Barbara Epstein | 29333-07 | Massachusetts |
| Anthony J. Walker & Pamela S. Mayer | 29335-07 | Massachusetts |
| Andre & Helen Laus | 29336-07 | Rhode Island |
| Parham Pouladdej | 29385-07 | Massachusetts |

payment of which the company gave him a $205,363.33 check and a $600,000 promissory note payable over three years.  The company and Mr. Edgerly itemized the buyout payment as follows:

| Description | Amount |
| --- | --- |
| Stock purchase price | $255,908 |
| Noncompetition payment | 400,000 |
| Company's debt to stockholder (principal) | 25,000 |
| Company's debt to stockholder (interest) | 2,553 |
| Company's note payable to stockholder (principal) | 122,177 |
| Company's note payable to stockholder (interest) | 11,976 |
| Shareholder's debt to company | (12,250) |
| Total due from company to stockholder | 805,364 |

The "Noncompetition payment" was for a "noncompetition and nonsolicitation agreement" that prohibited Mr. Edgerly from, inter alia, engaging in competitive activities from July 31, 2002, through July 31, 2003; and the $400,000 that Recovery Group paid for the covenant was comparable to Mr. Edgerly's annual earnings.

Mr. Orleans, Recovery Group's accountant, was involved with the buyout throughout.  As is noted above, he calculated the buyout amounts.  Mr. Gray, Recovery Group's president, did not discuss the tax implications of the buyout with Mr. Orleans when he asked him to compute the numbers.  When Recovery Group executed the buyout, Mr. Gray did not consider the tax ramifications of the deal; but he understood that some portion of the buyout payment was tax deductible while the remainder was

not.  Deductibility was not a consideration in his structuring the deal; rather, he assumed that the tax results would be what the accountants determined.

Recovery Group's accountants

Mr. Orleans began practicing as an accountant in 1973 and has been a certified public accountant (C.P.A.) since 1976.  At his accounting firm--Kanter, Troy, Orleans & Wexler, LLP-- Mr. Orleans was the relationship partner assigned to Recovery Group.  He was responsible for overseeing Recovery Group's accounting operations and managing the preparation of Recovery Group's financial statements and tax returns.  Mr. Orleans worked with Donald Troy, a tax specialist at his firm.  Mr. Troy was licensed as a C.P.A. in 1986, and he held a bachelor's degree in accountancy and a master's degree in taxation.  During the years in issue, Mr. Troy was the accounting firm's tax director.

Preparing Recovery Group's returns

Mr. Orleans relied upon Mr. Troy to make the technical decisions on how Recovery Group's tax returns should be prepared, and Recovery Group relied upon the accountants to make these decisions correctly.

When considering how to report Recovery Group's expense for the covenant not to compete on its tax returns, Mr. Troy consulted case law, together with the statutory language, regulations, and legislative history of section 197.  He

concluded that the covenant not to compete was not a section 197 intangible and thus was exempt from that section's 15-year amortization period.  Accordingly, he prepared Recovery Group's returns to amortize the covenant not to compete ratably over its 12-month term.  Since that 12-month term straddled the two years 2002 and 2003, he allocated the $400,000 between those two years (rather than over the 15 years 2002 through 2016)--i.e., roughly five-twelfths of the total ($166,663) in 2002 and the remainder, approximately seven-twelfths ($233,337), in 2003.  Those amounts constituted less than 2 percent of Recovery Group's deductions reported on the returns for those years.[4]

Approving Recovery Group's returns

Each year, Mr. Orleans presented the tax return for Recovery Group to Mr. Gray.  Mr. Gray held brief discussions with Mr. Orleans during those meetings, but he did not ask specific

---

[4]The Forms 1120S, U.S. Income Tax Return for an S Corporation, filed by Recovery Group reported the following:

| Item | 2002 | 2003 |
|------|------|------|
| Gross receipts or sales | $15,387,209 | $14,768,403 |
| Total deductions | 15,342,784 | 14,787,971 |
| Ordinary income (loss) | 19,889 | (14,046) |
| Federal taxable income | (23,571) | (6,639) |

Total deductions included the $166,663 claimed in 2002 and the $233,337 claimed in 2003 for the covenant not to compete, which in turn represented 1.09 percent of Recovery Group's total deductions for 2002 and 1.58 percent of its deductions for 2003.

questions or closely review the returns prepared by the company's accountants. Rather, he asked Mr. Orleans whether the returns represented what the company had to file, and he accepted Mr. Orleans's representations that they did. Mr. Gray did not discuss tax issues with Mr. Troy or specifically approve tax decisions he made, nor did he question Mr. Orleans about the positions taken in the returns or seek a second opinion on his accountants' work. Rather, because Mr. Gray's expertise is in business areas other than accounting and taxes, he left accounting and tax decisions to the professionals at the accounting firm that the company had hired. Mr. Gray did not review or inquire into the tax treatment of the covenant not to compete, which was reflected on pages 19 and 27 of the 50-page 2002 return and on pages 18 and 26 of the 55-page 2003 return.

Mr. Orleans signed the returns as the preparer, and Mr. Gray signed them as Recovery Group's president. Recovery Group timely filed its returns for the years in issue.

Notices of deficiency

The IRS determined that the covenant not to compete was an amortizable section 197 intangible, amortizable over 15 years beginning with the month of acquisition. Consequently, the IRS partially disallowed Recovery Group's deductions for the cost of the covenant not to compete, allowing amortization deductions of only $11,111 for 2002 and $26,667 for 2003, and disallowing

$155,552 for 2002 and $206,667 for 2003.[5]  The IRS also

determined accuracy-related penalties against Recovery Group for

2002 and 2003.

The disallowance of most of the deductions claimed for the

covenant for each year increased Recovery Group's income for each

year and hence each shareholder's share of Recovery Group's

income.  In notices of deficiency issued in October and November

2007 to the shareholders, the IRS determined deficiencies for the

shareholders accordingly.  The shareholders' deficiencies all

turn on the appropriate treatment of the covenant not to compete,

and they require no separate analysis.

The IRS issued a notice of deficiency to Recovery Group in

March 2008.  The shareholders and Recovery Group all timely filed

petitions in this Court.

OPINION

As a general rule, the IRS's determinations are presumed

correct, and the taxpayer has the burden of establishing that the

determinations in the notice of deficiency are erroneous.  Rule

---

[5]The disallowance of the deductions resulted in positive
Federal taxable income and triggered a corporate-level built-in
gains tax for both years in issue under section 1374(a).  Section
1374 imposes a corporate level tax on built-in gains recognized
by an S corporation during the 10 years following the
corporation's conversion from C corporation to S corporation
status.  Sec. 1374(a), (d)(3), (7).  The parties agree that if
respondent's position is sustained and the covenant not to
compete must be amortized over 15 years, then section 1374
applies.

142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Similarly, the taxpayer bears the burden of proving he is entitled to any disallowed deductions that would reduce his deficiency.  <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).[6]  With respect to a taxpayer's liability for penalties, section 7491(c) places the burden of production on the Commissioner.

I.   <u>Covenant not to compete</u>

The principal issue in these cases is whether the covenant not to compete that Recovery Group and its departing 23-percent shareholder entered into was, for purposes of section 197(d)(1)(E), "entered into in connection with an acquisition (directly or indirectly) of an interest in a trade or business or substantial portion thereof".  Recovery Group contends that the 23-percent interest it acquired by redemption was not a substantial interest and is therefore outside the reach of section 197.  In support of its argument, Recovery Group cites <u>Frontier Chevrolet Co. v. Commissioner</u>, 116 T.C. 289, 294-295 (2001), affd. 329 F.3d 1131 (9th Cir. 2003), which held that a redemption of 75 percent of a corporation's stock qualified as the indirect acquisition of an interest in a trade or business for purposes of section 197; and Recovery Group urges that its

_____

[6]Under certain circumstances the burden can shift to the IRS with respect to factual disputes pursuant to section 7491(a). However, Recovery Group does not contend that the burden has shifted.

23-percent acquisition is not on a par with the obviously substantial 75-percent acquisition in <u>Frontier</u>.  To resolve this issue, we consider first the nature of a covenant not to compete and then the provisions of section 197.

    A.   <u>Intangible assets</u>

The residual goodwill of a business is an intangible asset that is deemed to have an unlimited useful life, so that it cannot be amortized by the business that developed that goodwill. <u>Houston Chronicle Publg. Co. v. United States</u>, 481 F.2d 1240, 1247 (5th Cir. 1973); sec. 1.167(a)-3(a), Income Tax Regs. (26 C.F.R.).  Rather, that component of value remains with a business until the business ceases or is disposed of; and until then no tax benefit is obtained from the expense of developing the goodwill or for the value that is allocated to that intangible.  However, an intangible asset that can be valued distinctly and that has a measurable useful life is distinguishable from residual goodwill and may be amortized over its useful life.  See <u>Newark Morning Ledger Co. v. United States</u>, 507 U.S. 546, 566 (1993).

One such intangible is a covenant not to compete (or a "noncompetition covenant"), which is a "promise, usu[ally] in a sale-of-business, partnership, or employment contract, not to engage in the same type of business for a stated time in the same market as the buyer, partner, or employer."  Blacks's Law

Dictionary 420 (9th ed. 2009).  Someone purchasing a business or buying out a departing shareholder-employee's share of a business may benefit from the seller's assurance that he will not thereafter undermine the business by using his status in and familiarity with the business--that is, his assurance that he will not carry out with him, when he leaves, the intangible assets of the business (such as know-how, or customer relationships, or the identities of suppliers).  Thus, a covenant not to compete may have real and important value.  See Annabelle Candy Co. v. Commissioner, 314 F.2d 1, 7-8 (9th Cir. 1962), affg. T.C. Memo. 1961-170.

A covenant not to compete is an intangible asset that, unlike goodwill, does have a limited useful life, defined in the terms of the covenant; and the cost of obtaining such a covenant is, therefore, amortizable ratably over the life of the covenant, apart from the statute at issue in these cases (section 197). Warsaw Photographic Associates, Inc. v. Commissioner, 84 T.C. 21, 48 (1985); O'Dell & Co. v. Commissioner, 61 T.C. 461, 467 (1974). See generally sec. 1.167(a)-3, Income Tax Regs.

However, intangible assets in general--and covenants not to compete in particular--do present opportunities for distortion and abuse in reporting one's tax liability.  While the cost of purchasing a shareholder's stock is a capital expenditure that does not yield any tax benefit until the stock is disposed of,

the cost of a covenant not to compete will be promptly amortized over its life (again, apart from section 197).  This dynamic creates a tax-motivated incentive for a buyer to prefer that the money changing hands in a buyout transaction be characterized as paid for a covenant rather than for shares of stock.[7]

B.   Enactment of section 197

In the Omnibus Budget Reconciliation Act of 1993 (OBRA), Pub. L. 103-66, sec. 13261, 107 Stat. 532, Congress enacted section 197 to simplify the law regarding the amortization of intangibles.  H. Rept. 103-111, at 777 (1993), 1993-3 C.B. 167, 353.  In an attempt to eliminate controversy between taxpayers and the IRS regarding the tax treatment of the cost of acquiring an intangible asset, Congress established a fixed period for ratably amortizing that cost--recognizing that some of the intangibles so amortized will have useful lives longer than that period, and some will have useful lives shorter than that period. Id. at 760, 1993-3 C.B. at 336.

Congress excluded self-created intangibles from section 197 (unless they were created in connection with a transaction involving the acquisition of a trade or business or a substantial

---

[7]In contrast, a departing individual employee-shareholder has an incentive to allocate more of the price to the shares of stock and less to the covenant not to compete, because he will obtain capital gain treatment for his gain on the stock but ordinary income treatment for the consideration for the covenant not to compete.  See Sonnleitner v. Commissioner, 598 F.2d 464, 467 (5th Cir. 1979), affg. T.C. Memo. 1976-249.

portion thereof), id., and Congress specifically included certain covenants not to compete as "amortizable section 197 intangibles". Prior law had allowed taxpayers to amortize those covenants under section 167 over the life of the covenant. Id. New section 197(a), however, required amortization over 15 years--a requirement applicable to covenants not to compete that are described in subsection (d)(1)(E).

C.   Statutory language

Section 197 provides, in pertinent part:

SEC. 197. AMORTIZATION OF GOODWILL AND CERTAIN OTHER
         INTANGIBLES.

(a)  General Rule.  A taxpayer shall be entitled to an amortization deduction with respect to any amortizable section 197 intangible.  The amount of such deduction shall be determined by amortizing the adjusted basis (for purposes of determining gain) of such intangible ratably over the 15-year period beginning with the month in which such intangible was acquired.

*    *    *    *    *    *    *

(c)  Amortizable Section 197 Intangible.  For purposes of this section--

(1)  In general.  Except as otherwise provided in this section, the term "amortizable section 197 intangible" means any section 197 intangible--

(A)  which is acquired by the taxpayer after the date of the enactment of this section, and

(B)  which is held in connection with the conduct of a trade or business or an activity described in section 212.

\* \* \* \* \* \* \*

(d)  Section 197 Intangible.  For purposes of this section--

(1)  In general.  Except as otherwise provided in this section, the term "section 197 intangible" means--

\* \* \* \* \* \* \*

(E)  any covenant not to compete (or other arrangement to the extent such arrangement has substantially the same effect as a covenant not to compete) <u>entered into in connection with an acquisition (directly or indirectly) of an interest in a trade or business or substantial portion thereof</u> \* \* \*.  [Emphasis added.]

Thus, Mr. Edgerly's covenant not to compete with Recovery Group is a section 197 intangible if it was "entered into in connection with an acquisition (directly or indirectly) of an interest in a trade or business or substantial portion thereof".  Sec. 197(d)(1)(E).  The applicability of several of the statutory terms is not in dispute:  The covenant with Mr. Edgerly was acquired by Recovery Group "after the date of the enactment of" section 197[8] and was "held in connection with the conduct of a

---

[8]The effective date of Section 197 was August 10, 1993.  See OBRA sec. 13261(g), 107 Stat. 540; <u>Spencer v. Commissioner</u>, 110 T.C. 62, 87 n.30 (1998), affd. without published opinion 194 F.3d 1324 (11th Cir. 1999).

trade or business".[9] Sec. 197(c)(1). Recovery Group does not

dispute that an acquisition of stock can be "an acquisition

(directly or indirectly) of an interest in a trade or

business";[10] and Recovery Group necessarily concedes that its

redemption of Mr. Edgerly's stock was an indirect acquisition of

that stock.

However, Recovery Group contends that Mr. Edgerly's

23-percent stock interest was not "substantial"--a contention

that requires careful attention to the precise language of

section 197(d)(1)(E): "acquisition * * * of an interest in a

---

[9]Furthermore, a covenant not to compete that is a section 197 intangible may not be treated as disposed of (or becoming worthless) even if the covenant expires or actually becomes worthless, unless the entire interest in a trade or business that was acquired with the covenant is also disposed of or becomes worthless. Sec. 197(f)(1)(B); H. Conf. Rept. 103-213, at 694-695 (1993), 1993-3 C.B. 393, 572-573. Recovery Group does not assert that the 23 percent of itself that it redeemed from Mr. Edgerly became worthless when the term of the covenant expired; accordingly, we need not and do not consider whether a deduction is allowable under the disposition rules of section 197(f)(1). These cases turn on whether the instant covenant not to compete is an amortizable section 197 intangible. If it is, then a 15-year amortization is required by the statute.

[10]If there were any doubt, the legislative history of section 197 makes it clear that "For this purpose, an interest in a trade or business includes not only the assets of a trade or business, but also stock in a corporation that is engaged in a trade or business or an interest in a partnership that is engaged in a trade or business." H. Conf. Rept. 103-213, supra at 677, 1993-3 C.B. at 555. See Frontier Chevrolet Co. v. Commissioner, 116 T.C. 289, 294-295 (2001) (redemption of stock qualifies as the indirect acquisition of an interest in a trade or business for purposes of section 197), affd. 329 F.3d 1131 (9th Cir. 2003).

trade or business or substantial portion thereof". Recovery Group's contention prompts three interpretive questions:

- What does "interest" mean?

- What does "thereof" modify?--"interest" or "trade or business"?

- If "thereof" modifies "interest", then what is a "substantial portion" of an interest?

Recovery Group maintains that "interest in a trade or business" must mean a 100-percent ownership interest and that "thereof" modifies "interest". Recovery Group therefore concludes that a covenant gets 15-year amortization only if it was obtained either in an acquisition of a 100-percent "interest in a trade or business" or in an acquisition of a substantial portion of an interest in a trade or business; and it argues that Mr. Edgerly's 23 percent portion that Recovery Group redeemed was not "substantial".

Respondent maintains that "thereof" modifies "trade or business", and that "interest" means an ownership interest of any percentage, large or small. Respondent therefore concludes that a covenant gets 15-year amortization if it was obtained either in an acquisition of any "interest in a trade or business" (such as Mr. Edgerly's stock) or in an acquisition of a substantial portion of a trade or business--i.e., a substantial portion of its assets (not at issue here)--and respondent argues that it is

therefore immaterial whether Mr. Edgerly's 23-percent stock interest would be characterized as "substantial".  We agree with respondent, for the reasons we explain below; and we hold, in the alternative, that a 23-percent stock interest is substantial.

    D.    <u>Analysis of statutory terms and purpose</u>

        1.    <u>The meaning of "interest"</u>

The phrase "trade or business" appears in five different places in section 197,[11] but the phrase "<u>an interest in</u> a trade or business" appears only in subsection (d)(1)(E).  An "interest" is "[a] legal share in something; <u>all or part</u>[12] of a legal or

_____

[11]See section 197(c)(1)(B) (an "amortizable section 197 intangible" is "held in connection with the conduct of a trade or business"), (2) (flush language) (self-created intangibles are subject to section 197 if "created in connection with a trans-action * * * involving the acquisition of assets constituting a trade or business or substantial portion thereof"), (d)(1)(E) (covenants not to compete); (e)(3)(A)(ii) (computer software is not subject to section 197 if it "is not acquired in a transaction * * * involving the acquisition of assets constitut-ing a trade or business or substantial portion thereof"); and (e)(7) (rights to service a mortgage are subject to section 197 if "acquired in a transaction * * * involving the acquisition of assets * * * constituting a trade or business or substantial portion thereof").

[12]As "interest" is used outside the context of section 197, one who owns an "interest" may own a "fractional interest", see, e.g., <u>Estate of Mellinger v. Commissioner</u>, 112 T.C. 26, 33 (1999), which might consist of a "minority interest", see, e.g., <u>Holman v. Commissioner</u>, 130 T.C. 170, 183 (2008), or a "majority interest", see, e.g., <u>Estate of Bongard v. Comissioner</u>, 124 T.C. 95, 123 (2005), also referred to as a "controlling interest", see, e.g., <u>Square D Co. & Subs. v. Commissioner</u>, 121 T.C. 168, 195 (2003); or one might own an "entire interest", <u>Shepherd v. Commissioner</u>, 115 T.C. 376, 378 (2000), affd. 283 F.3d 1258 (11th Cir. 2002).

equitable claim to or right in property".  Black's Law Dictionary 885 (9th ed. 2009) (emphasis added).  Thus, the word "interest" sometimes does and sometimes does not have the significance that Recovery Group urges--i.e., ownership of all of something (namely, a trade or business).  However, Recovery Group's interpretation is problematic here.  Section 197(d)(1)(E) applies in the case of an acquisition of "an interest", not "the interest".  We must presume that Congress's use of the indefinite article before "interest" was deliberate.  Considering the purpose of this language (to capture covenants obtained in connection with both stock and asset acquisitions, as is discussed below in part I.D.2) and our holding in Frontier Chevrolet (discussed below in part I.E), we hold that "an interest" in section 197(d)(1)(E) may consist of a portion--all or a part--of the ownership interest in a trade or business.

In Frontier Chevrolet we rejected the taxpayer's contention that only the acquisition of a new business triggered section 197(d)(1)(E).  Likewise, here we must reject Recovery Group's interpretation that "an interest" means only "the entire interest."  We hold, instead, that "an interest in a trade or business" in section 197(d)(1)(E) includes the 23-percent minority interest acquired by Recovery Group.[13]  Moreover,

---

[13]We decide only the 23-percent case before us and do not address hypothetical facts not present here (e.g., a de minimis
(continued...)

Recovery Group's interpretation of "an interest" becomes even more problematic if, as we hold below, "thereof" refers not to "an interest" but rather to "trade or business". If "an interest" in section 197(d)(1)(E) meant "the entire interest", then a redemption could never trigger that section because a corporation may not entirely deprive itself of shareholders by redeeming all its stock. Rather than overturn our holding in <u>Frontier Chevrolet</u> as Recovery Group's interpretation would logically require, we affirm and apply to new facts the reasoning from that case.

2. The antecedent of "thereof"

Recovery Group counters with the argument that interpreting "an interest" to mean even a minority interest nullifies the subsequent language that looks to whether the acquisition is of a "substantial portion"; but this argument reflects confusion about what the "portion" is that the statute requires to be "substantial". Recovery Group contends that in the statutory phrase at issue--"an acquisition * * * of an <u>interest</u> in a <u>trade or business</u> or substantial <u>portion thereof</u>"--the antecedent of the word "thereof" is "interest", so that 15-year amortization is required when a covenant is entered into in connection with an acquisition of either an (entire) interest <u>or</u> a substantial

---

[13](...continued)
stock interest in a publicly traded company).

portion of an interest in a trade or business.  The alternative interpretation that "an interest" includes a minority interest removes the effect (Recovery Group argues) of the statutory provision that an interest must be "substantial" before it triggers section 197.

The fallacy in Recovery Group's position is a grammatical mistake about the antecedent of "thereof".  Respondent contends, and we agree, that the antecedent of "thereof" is "trade or business", so that 15-year amortization is required when a covenant is entered into in connection with an acquisition of either an interest (i.e., an entire or fractional stock interest) in a trade or business or assets constituting[14] a substantial portion of a trade or business.  This reading coincides both with explicit language in the legislative history and with the legislative purpose.

The legislative history is unmistakable on the point that the "substantial portion" in section 197(d)(1)(E) is a substantial portion of a trade or business.  The conference report states:

> Exceptions to the definition of a section 197 intangible
>
> In general.-- The bill contains several exceptions to the definition of the term "section 197 intangible."

---

[14]Section 197(d)(1)(E) does not include the words "assets constituting" that we interpolate in the text above, but those words are implicit there for the reasons discussed hereafter.

Several of the exceptions contained in the bill apply only if the intangible property is not acquired in a transaction * * * that involves the acquisition of assets which constitute a trade or business or a <u>substantial portion of a trade or business</u>. * * *

The determination of whether acquired assets constitute a <u>substantial portion of a trade or business</u> is to be based on all of the facts and circumstances, including the nature and the amount of the assets acquired as well as the nature and amount of the assets retained by the transferor.  It is not intended, however, that the value of the assets acquired relative to the value of the assets retained by the transferor is determinative of whether the acquired assets constitute a <u>substantial portion of a trade or business</u>.

\*      \*      \*      \*      \*      \*      \*

In determining whether a taxpayer has acquired an intangible asset in a transaction * * * that involves the acquisition of assets that constitute a trade or business or a <u>substantial portion of a trade or business</u> * * *, any employee relationships that continue (or <u>covenants not to compete</u> that are entered into) as part of the transfer of assets are to be taken into account in determining whether the transferred assets constitute a trade or business or a <u>substantial portion of a trade or business</u>.

H. Conf. Rept. 103-213, at 678-679, 1993-3 C.B. at 556-557 (emphasis added).  Thus, when Congress wrote "an interest in a trade or business or substantial <u>portion thereof</u>" (emphasis added), it referred to a substantial portion <u>of a trade or business</u> (not a substantial portion of <u>an interest in</u> a trade or business).  Subsection (d)(1)(E) thus presents a duality-- acquisition of a stock interest and acquisition of a substantial portion of assets.  This duality was explicit in Congress's purpose.

Congress's purpose in enacting section 197(d)(1)(E) was to impose 15-year amortization both when a stock acquisition[15] includes a covenant not to compete and when a substantial asset acquisition includes a covenant not to compete; and the interpretation we adopt today accomplishes that purpose. Section 197(d)(1)(E) includes the phrase "an interest in a trade or business or substantial portion thereof" (emphasis added), rather than the phrase "assets constituting a trade or business or substantial portion thereof" (emphasis added) used elsewhere.[16] The "interest in" phrase was included with reference to covenants not to compete in order to make it clear that the acquisitions that trigger section 197 encompass "not only the assets of a trade or business but also stock in a corporation that is engaged in a trade or business". H. Conf. Rept. 103-213, supra at 677, 1993-3 C.B. at 555 (emphasis added).

Recovery Group's interpretation of the statute would impose the 15-year amortization in the case of an acquisition of an entire stock interest or a substantial stock interest but would

---

[15]See Frontier Chevrolet Co. v. Commissioner, 329 F.3d at 1135 ("both stock acquisitions and redemptions involve acquiring an interest in a trade or business by acquiring stock of a corporation engaged in a trade or business").

[16]The phrase "assets constituting a trade or business or substantial portion thereof" (emphasis added) appears in subsection (c)(2) (flush language) (self-created intangibles); subsection (e)(3)(A)(ii) (computer software); and subsection (e)(7) (rights to service a mortgage)).

find the statute silent about asset acquisitions, thus failing to vindicate the legislative purpose.  We prefer instead the interpretation that accomplishes Congress's aim to reach covenants not to compete in both stock acquisitions (i.e., acquisitions of "an interest in a trade or business") and acquisitions of a "substantial portion" of the assets of "a trade or business".  Under this reading of the statute, the question whether an acquisition is "substantial" arises only with reference to asset acquisitions.  On the other hand, where a covenant not to compete is entered into in connection with a stock acquisition of any size--substantial or not substantial-- that covenant is an amortizable section 197 intangible.

3.    What interest would be "substantial"?

Even if "thereof" modified "an interest" and thereby limited the application of section 197 to acquisitions of a "substantial interest", Recovery Group's assumption that a 23-percent stock interest is not substantial is not well supported.  The term "substantial portion" is not defined in section 197 (enacted in 1993) nor in the regulations thereunder, so Recovery Group finds a suggestion of its meaning in a 1997 amendment[17] to an unrelated provision--section 1397C, which defines "enterprise zone business".  The amendment made two changes that, when taken in

_____

[17]See Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 956(a)(1)-(3), 111 Stat. 890, 1997-4 C.B. (Vol. 1) 104.

tandem (Recovery Group says), show that "substantial portion" must mean 50 percent or more. First, the amendment substituted "50 percent" in place of "80 percent" in section 1397C(b)(2) and (c)(1); and second, it substituted "substantial portion" in place of the term "substantially all" in section 1397C(b)(3)-(5) and (c)(2)-(4). Recovery Group infers therefrom that the pre-amendment "substantially all" meant 80 percent or more, while the post-amendment "substantial portion" means 50 to 80 percent. From this Recovery Group argues that for an "interest" to be a "substantial portion" under section 197, it must likewise be 50 percent or more.

There are at least two fatal flaws in this argument. First, the percentages in section 1397C(b)(2) and (c)(1) (originally "80 percent" and now "50 percent") refer to the amount of a business's <u>gross income</u> derived within an empowerment zone; but the phrase "substantial portion" (in different subsections--i.e., section 1397C(b)(3)-(5) and (c)(2)-(4)) refers to the quantum of the business's <u>property</u> used and <u>services</u> performed in an empowerment zone. Recovery Group's argument presumes that section 1397C expressly provides that a "substantial portion" is one consisting of "50 percent" or more-- but the statute says no such thing. The income percentage provisions and the "substantial portion" provisions are independent criteria for qualifying a business or a

proprietorship as an enterprise zone business.  Thus, even in section 1397C itself, there is no connection between the "substantial portion" term and the "50 percent" term; and "substantial portion" is no more defined in section 1397C than it is in section 197(d)(1)(E).  The most that can be said is that the Congress that amended section 1397C had these "substantial portion" and "50 percent" phrases in mind at the same time, but in different connections.

The second flaw in this argument is that the "empowerment zone" provisions of section 1397C, amended in 1997, simply bear no connection or similarity to the amortization-of-intangibles provisions of section 197, enacted in 1993.  Recovery Group makes no showing that the purposes of the two statutes have any particular congruence or similarity, and we discern none.  Section 1397C is too remote an analogy to shed any light on the meaning of section 197(d)(1)(E).  This is Recovery Group's only suggestion of statutory guidance on what is "substantial", and we do not find it illuminating.

In other provisions one could find, in a variety of circumstances, "substantial" percentages that are much <u>less</u> than 50 percent.  For example--

- For some retirement plan purposes, a "substantial owner" is one who, inter alia, "owns, directly or indirectly, more than 10 percent in value of either the

voting stock of that corporation or all the stock of that corporation."  29 U.S.C. sec. 1321(d)(3) (2006).

- A "substantial understatement" of tax is an understatement that "exceeds * * * 10 percent of the tax required to be shown on the return". Sec. 6662(d)(1)(A).

- "[N]o substantial part" of a tax-exempt organization's activity may be political activity, sec. 501(c)(3), with "substantial" defined, in effect, on a sliding scale that reaches as low as 7-1/2 percent of its expenditures (i.e., 150 percent, see sec. 501(h)(2), of "5 percent of the excess of the exempt purposes expenditures over $1,500,000", sec. 4911(c)(2)).[18]

- For income tax treaty purposes, a "substantial interest" in a foreign company's stock could be "10 percent or more".  See 1972-1 C.B. 438, 439.

- For estate tax purposes, former section 2036(c)(3)(A)[19] defined a "substantial interest" in an enterprise as

---

[18]Cf. Seasongood v. Commissioner, 227 F.2d 907, 912 (6th Cir. 1955) (where "something less than 5% of the time and effort of the League was devoted to the activities that the Tax Court found to be 'political' * * * the so-called 'political activities' of the League were not in relation to all of its other activities substantial"), revg. 22 T.C. 671 (1954).

[19]In 1990, former section 2036(c) was repealed, and former subsection (d) was redesignated section 2036(c)).  See Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11601, 104 Stat. 1388-490.

the ownership of 10 percent or more of the voting power or income stream or both of such enterprise.

However, we see no reason to suppose that the purposes of section 197 would be served by measuring substantiality in ways that were conceived to vindicate the purposes of those very different provisions, which are no more like section 197 than the "empowerment zone" provisions that Recovery Group puts forward. If we look instead to the statute at issue for some explicit indication of whether Congress would have considered a 23-percent ownership interest to be significant and, presumably, "substantial", the only hint we find--if indeed it is even a hint--is in the anti-churning[20] rules in section 197(f)(9). In that provision Congress defined "related person" by importing rules from sections 267(b) and 707(b)(1); but in doing so it adjusted those rules by reducing the ownership percentage that triggers restrictions--from 50 percent to 20 percent.

---

[20]The anti-churning rules of section 197(f)(9) aim to:

> prevent taxpayers from converting existing goodwill, going concern value, or any other section 197 intangible for which a depreciation or amortization deduction would not have been allowable under present law into amortizable property to which the bill applies.

H. Conf. Rept. 103-213, supra at 691, 1993-3 C.B. at 569. Congress sought specifically to prevent taxpayers from transferring property for the purpose of generating deductions, and it imposed more stringent definitions of "related person" to prevent transfers among related parties from qualifying an intangible for amortization under the new provisions.

Sec. 197(f)(9)(C)(i).  Thus, in order for section 197(f)(9)(A) to disqualify an otherwise eligible amortizable section 197 intangible, the taxpayer or a related person need own (directly or indirectly) only 20 percent of the value of the outstanding stock in a corporation to which he transferred or licensed, or from which he acquired or licensed, that intangible.  Congress did not declare such a 20-percent interest "substantial"; but the provision does indicates that someone who owns as little as 20 percent of the stock of a company came within the focus of Congress's concern when it enacted section 197.  This congressional concern behind section 197(f)(9) is admittedly different from the specific concern behind section 197(d)(1)(E), but the two provisions are part of the same enactment and pertain to the same general subject:  tax avoidance using intra-owner stock sales to affect the tax treatment of the cost of intangibles.  That the anti-churning provision of section 197(f)(9) is triggered in the case of a 20-percent stock interest might suggest that a 20-percent interest would be considered "substantial".[21]  And if so, then the 23-percent interest at issue here would also be substantial.

If, on the other hand, section 197(f)(9) bears no important relation to section 197(d)(1)(E) and sheds no light on what would

_____

[21]We emphasize that we do not hold here that to be "substantial" an interest must equal or exceed 20 percent.

be a "substantial portion" of a stock interest for purposes of triggering 15-year amortization of a covenant not to compete, then section 197 does nothing to define "substantial". Nonetheless, even in that event, Recovery Group's transaction would still implicate the concern that Congress evinced in enacting section 197(d)(1)(E). Recovery Group paid a total of $655,907 to Mr. Edgerly for his stock and his agreement not to compete. The covenant not to compete was for a short term--only one year--and the stock was certainly not a negligible part of the transaction. Rather, the parties stated its value as $255,907; it was enough stock that one could have avoided tax by understating its value. That is, the stock interest here was "substantial" enough to implicate the risk that section 197(d)(1)(E) was designed to prevent.

Thus, Recovery Group has not convinced us that a 23-percent interest would not be considered "substantial". And in any event, "thereof" does not modify "an interest"; and therefore an interest need not be "substantial" to trigger the application of section 197(d)(1)(E).

E. Frontier Chevrolet

Recovery Group cites Frontier Chevrolet Co. v. Commissioner, 116 T.C. 289, 294-295 (2001), affd. 329 F.3d 1131 (9th Cir. 2003), as if it contradicts this conclusion--as if Frontier Chevrolet holds that a stock interest of more than 23 percent

must be acquired before a covenant not to compete will be treated as a section 197 intangible, and as if a stock interest must be equivalent to the 75-percent interest in <u>Frontier Chevrolet</u> in order to be substantial.  This argument aggressively misreads <u>Frontier Chevrolet</u>, which in fact says nothing at all about what is "substantial" under section 197 and says nothing that would help Recovery Group.

We held in <u>Frontier Chevrolet</u> (where the taxpayer corporation redeemed 75 percent of its stock) that a redemption of stock qualifies as direct or indirect acquisition of an interest in a trade or business for purposes of section 197.  We rejected the taxpayer's argument that the statute requires the acquisition of an interest in a new or different trade or business.  In affirming this Court's holding that Frontier entered into the covenant not to compete in connection with its acquisition of an interest in a trade or business, and that it must therefore amortize the cost of the covenant over 15 years, the Court of Appeals for the Ninth Circuit confirmed that section 197 "only requires taxpayers to acquire an interest in <u>a</u> trade or business", not "an interest in a <u>new</u> trade or business" (as the taxpayer had argued).  <u>Frontier Chevrolet Co. v. Commissioner</u>, 329 F.3d at 1134.  The Court of Appeals considered only the case before it, stating:

> The parties do not dispute that they entered into the
> covenant after the effective date of § 197, or that

> Frontier held the covenant in connection with the conduct of a trade or business. Accordingly, the only issue we address is whether a redemption of 75% of a taxpayer's stock constitutes an indirect acquisition of an interest in a trade or business for purposes of § 197. We need not and do not decide whether all stock redemptions made in connection with an execution of a covenant not to compete constitute an acquisition of an interest in a trade or business within the meaning of § 197.

Id. at 1134 n.2. Recovery Group lays special stress on the final sentence of the Court of Appeals' footnote, as if by disclaiming a holding as to "all stock redemptions", the Court of Appeals thereby intimated that some stock redemptions do not constitute "an acquisition * * * of an interest in a trade or business" within the meaning of section 197(d)(1)(E); and Recovery Group urges that its 23 percent acquisition was not substantial enough to meet the standard for such acquisitions that is (it suggests) implicit in Frontier Chevrolet.

However, the taxpayer in Frontier Chevrolet argued that only covenants entered into in connection with the acquisition of a new trade or business were section 197 intangibles. Both the Tax Court and the Court of Appeals disagreed, holding that the taxpayer's redemption of 75 percent of its own stock effected an indirect acquisition of a trade or business. Neither court was asked to rule or did rule on whether a redemption smaller than 75 percent might result in the acquisition of an interest in a trade or business for purposes of section 197(d)(1)(E).

We therefore answer in these cases a question not asked in Frontier Chevrolet--namely, whether a corporation that redeems not 75 percent but 23 percent of its stock thereby makes "an acquisition (directly or indirectly) of an interest in a trade or business".

The car dealership in Frontier Chevrolet redeemed a 75-percent shareholder, and the remaining shareholder (i.e., the 25-percent shareholder pre-redemption) became the sole shareholder. Recovery Group makes much of the fact that none of its remaining shareholders obtained a controlling interest in Recovery Group as a result of the redemption at issue, unlike the sole remaining shareholder in Frontier Chevrolet. However, we do not interpret the statute to require the acquisition of a controlling interest, nor is our interpretation inconsistent with the Tax Court opinion or the Court of Appeals opinion in that case.

In both Frontier Chevrolet and these cases, the departing shareholder agreed to refrain from competing with the company and received consideration not only for stock but also for the covenant not to compete. Each covenant protected the company against competition from a former shareholder; both companies obtained the covenants via redemptions involving their acquisition of "an interest in a trade or business" as is discussed above in part I.D.2; and therefore both covenants not to compete are amortizable section 197 intangibles.

We hold that Recovery Group's redemption of 23 percent of its stock was an acquisition of an interest in a trade or business, that the covenant not to compete is thus a section 197 intangible, and that Recovery Group must amortize the $400,000 cost of the covenant over 15 years under section 197.  The IRS's deficiency determinations will be sustained.

II.  Accuracy-related penalty under section 6662

A.  General principles

Section 6662 imposes an "accuracy-related penalty" of 20 percent of the portion of the underpayment of tax attributable to any substantial understatement of income tax.  See sec. 6662(a), (b)(2).[22]  By definition, an understatement of income tax for an S corporation is substantial if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return.  Sec. 6662(d)(1).  Pursuant to section 7491(c), the Commissioner bears the burden of production and must produce sufficient evidence showing the imposition of the penalty is appropriate in a given case.  Higbee v. Commissioner, 116 T.C.

---

[22]Under section 6662(b)(1), the accuracy-related penalty is also imposed where an underpayment is attributable to the taxpayer's negligence or disregard of rules or regulations; and respondent argues that Recovery Group's position reflects negligence.  However, as we show below, respondent has demonstrated that Recovery Group substantially understated its income tax for the years in issue for purposes of section 6662(b)(2).  Thus, we need not consider whether, under section 6662(b)(1), Recovery Group was negligent or disregarded rules or regulations.

438, 446 (2001).  Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect.  Rule 142(a); Higbee v. Commissioner, supra at 447.

A taxpayer who is otherwise liable for the accuracy-related penalty may avoid the liability if it successfully invokes one of three other provisions:  Section 6662(d)(2)(B) provides that an understatement may be reduced, first, where the taxpayer had substantial authority for its treatment of any item giving rise to the understatement or, second, where the relevant facts affecting the item's treatment are adequately disclosed and the taxpayer had a reasonable basis for its treatment of that item.  Third, section 6664(c)(1) provides that, if the taxpayer shows that there was reasonable cause for a portion of an underpayment and that it acted in good faith with respect to such portion, no accuracy related penalty shall be imposed with respect to that portion.  Whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including its efforts to assess its proper tax liability, its knowledge and experience, and the extent to which it relied on the advice of a tax professional.  Sec. 1.6664-4(b)(1), Income Tax Regs.

B.    Application to Recovery Group

1.    Substantial understatement

Recovery Group reported negative taxable income for both 2002 and 2003.  See supra note 4.  The IRS determined built-in gains tax for both years and deficiencies of $46,138 for 2002 and $70,011 for 2003, and we have upheld these determinations. Recovery Group's understatement for each year thus exceeds both $5,000 and 10 percent of the tax required to be shown on its return, and both understatements are therefore substantial. Respondent has carried the burden of production imposed by section 7491(c).  The accuracy-related penalty is mandatory; the statute provides that it "shall be added".  Sec. 6662(a). Recovery Group bears the burden of proving any defenses, such as substantial authority, disclosure and reasonable basis, and reasonable cause and good faith.  See Higbee v. Commissioner, supra at 446.

2.    Defenses

a.    Substantial authority for positions taken

Only where the weight of the authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary positions does substantial authority for a tax treatment exist.  See Norgaard v. Commissioner, 939 F.2d 874, 880 (9th Cir. 1991), affg. in part and revg. in part on another ground T.C. Memo. 1989-390; sec.

1.6662-4(d)(3)(i), Income Tax Regs. The substantial-authority standard is less stringent than the more-likely-than-not standard (met only when the likelihood of a position being upheld is greater than 50 percent), but it is more stringent than the reasonable-basis standard. Sec. 1.6662-4(d)(2), Income Tax Regs. "Substantial authority" is found in: the Internal Revenue Code and other statutes; regulations construing the statutes; case law; and legislative intent reflected in committee reports. Sec. 1.6662-4(d)(3)(iii), Income Tax Regs. The weight of an authority depends on its source, persuasiveness, and relevance. Sec. 1.6662-4(d)(3)(ii), Income Tax Regs.

Mr. Troy testified that the legislative history convinced him that some covenants not to compete could still be amortized over their useful lives under section 167. In that conclusion he was certainly correct; section 197 attaches only to certain covenants not to compete--i.e., those acquired in connection with the acquisition of an interest in a trade or business or substantial portion thereof. However, Mr. Troy's reliance on the Court of Appeals' footnote in Frontier Chevrolet Co. v. Commissioner, 329 F.3d at 1134 n.2, was misplaced. The Court of Appeals stated that it need not and did not decide whether all stock redemptions constitute acquisitions of interests in a trade or business. The court left that question for another day. The most that can be said in Recovery Group's favor is that Frontier

<u>Chevrolet</u> did not foreclose the argument that a 23-percent redemption is not an acquisition of an interest in a trade or business; it does not affirmatively support that argument.

While "a taxpayer may have substantial authority for a position that is supported only by a well-reasoned construction of the applicable statutory provision", sec. 1.6662-4(d)(3)(ii), Income Tax Regs., in these cases Recovery Group used its unwarranted extrapolation from the footnote in <u>Frontier Chevrolet</u> to impute into the statute a requirement that the interest acquired be a majority interest or some substantial interest greater than 23 percent. This is not a well-reasoned statutory construction. We find that the substantial authority exception does not apply.

b.    <u>Disclosure and reasonable basis for treatment</u>

Provided the taxpayer adequately disclosed the relevant facts affecting the tax treatment of an item and had a reasonable basis for its treatment, no accuracy-related penalty may be imposed for a substantial understatement of income tax with respect to that item. Sec. 6662(d)(2)(B)(ii); sec. 1.6662-4(e), Income Tax Regs. A taxpayer may adequately disclose by providing sufficient information on the return to enable the IRS to identify the potential controversy. <u>Schirmer v. Commissioner</u>, 89 T.C. 277, 285-286 (1987). Recovery Group fails to qualify for

this defense because it did not adequately disclose the item at issue.

Recovery Group's returns for the years in issue list the deductions for the covenant not to compete as individual line items on two statements itemizing "other deductions" for each year. These entries recite "NON COMPETE EXPENSE" and the amount deducted; they provide no further details, such as Recovery Group's entering into this covenant not to compete in the redemption transaction with Mr. Edgerly. We find that Recovery Group's returns did not include sufficient facts to provide the IRS with actual or constructive knowledge of the potential controversy involved with Recovery Group's deduction of the cost of the covenant not to compete. While Recovery Group did list the deduction on its return, merely claiming the expense was insufficient to alert the IRS to the circumstances of the acquisition of the covenant or the decision by Recovery Group's accountants not to treat the covenant as an amortizable section 197 intangible. West Covina Motors, Inc. v. Commissioner, T.C. Memo. 2008-237; see also Robnett v. Commissioner, T.C. Memo. 2001-17. The adequate disclosure exception does not apply.

c.   Reasonable cause

For purposes of section 6664(c), a taxpayer may be able to demonstrate reasonable cause and good faith (and thereby escape the accuracy-related penalty of section 6662) by showing its

reliance on professional advice. See sec. 1.6664-4(b)(1), Income Tax Regs. However, reliance on professional advice is not an absolute defense to the section 6662(a) penalty. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). A taxpayer asserting reliance on professional advice must prove: (1) that his adviser was a competent professional with sufficient expertise to justify reliance; (2) that the taxpayer provided the adviser necessary and accurate information; and (3) that the taxpayer actually relied in good faith on the adviser's judgment. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d. Cir. 2002).

Mr. Orleans, a certified public accountant, was involved with the buyout agreement from the beginning, and he had access to correct information and to all the information he needed to properly evaluate the tax treatment of the cost of the covenant. Mr. Orleans relied in turn on Mr. Troy, another qualified professional and a tax specialist in his accounting firm, to determine the tax treatment of the covenant. Recovery Group's president, Mr. Gray, testified that he was a businessman and not a tax expert and that he hired accountants to ensure that his company's books were properly kept and its tax returns were properly filed. We are satisfied that Recovery Group's accountants were competent professionals with sufficient

expertise to justify Recovery Group's reliance, that they had the necessary information, and that Recovery Group actually relied on its accountants in good faith.

In <u>United States v. Boyle</u>, 469 U.S. 241, 251 (1985), the Supreme Court stated:

> When an accountant or attorney <u>advises</u> a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * *

Neither the special rules for the amortization of intangibles that Congress enacted in section 197, nor the rule in section 197(d)(1)(E) applying that regime to covenants not to compete, nor the exception for such covenants when they are not "entered into in connection with an acquisition (directly or indirectly) of an interest in a trade or business or substantial portion thereof"--none of these provisions is likely to be known even to the sophisticated manager of a business like Recovery Group. Much less are these rules intuitive. With the Internal Revenue Code as complicated as it is, corporate taxpayers with even moderately complex transactions are effectively required to consult tax professionals to prepare their returns. When they do consult such professionals, when they disclose their facts, and

when they then rely on the advice they are given, they should not be penalized; and section 6664(c) assures that they will not be.

After considering all the facts and circumstances, we find that Recovery Group has established that it had reasonable cause and acted in good faith with respect to the substantial understatements of income tax for the years in issue. Respondent's determination of the accuracy-related penalty will not be sustained.

To reflect the foregoing,

<u>Decisions will be entered for respondent as to the deficiencies in all dockets and for petitioner in docket No. 12430-08 as to the penalties under section 6662(a)</u>.